UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 11 CR 659 |
| vs. | ) | |
| | ) | Hon. Robert W. Gettleman |
| JEFFREY SULASKI | ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, hereby submits this Sentencing Memorandum with respect to defendant Jeffrey Sulaski in the above-captioned matter. For the reasons set forth below, the government respectfully requests that the Court sentence defendant within the applicable Guidelines range of 151 to 188 months' imprisonment.

**I.    BACKGROUND**

    **A.    Proceedings to Date**

On July 25, 2012, defendant pleaded guilty, pursuant to a plea agreement, to one count of attempted extortion and two counts of bank robbery, and stipulated to two additional bank robberies pursuant to the plea agreement. R. 26. On March 5, 2014, defendant was sentenced by this Court to 151 months' imprisonment. R. 62. On March 10, 2014, defendant filed a notice of appeal to the Seventh Circuit. R. 64. On March 12, 2015, the Seventh Circuit granted the joint motion for summary reversal

1

and remand for re-sentencing in light of *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015). R. 78. The re-sentencing is scheduled for August 1, 2017.

### B. Defendant's Offense Conduct

Details regarding defendant's offense conduct is set forth in the plea agreement, the Presentence Investigation Report, and the Government's Version of the Offense.

In this case, defendant robbed three TCF Banks located in Jewel-Osco stores in the Chicago area, one of which he robbed twice. Defendant also attempted to extort approximately $65,000 from Chase Bank by threatening to hurt a bank manager if the manager did not take the money out of the bank as defendant instructed. On March 12, 2011, defendant called the Chase Bank branch located at 2501 North Clark Street, Chicago, Illinois, and directed the bank manager to take 50s and 100s and take the money to a nearby dumpster. Defendant told the bank manager that he had followed the manager and other bank employees home, and that they would be harmed if the manager did not do as he instructed. As a result of defendant's threats, the manager retrieved approximately $65,000 of bank funds, and left the money at a location outside the bank.

On or about March 29, 2011, defendant approached a teller at a TCF Bank branch within a Jewel-Osco store located at 4250 North Lincoln Avenue, Chicago, Illinois, and stated something to the effect of, "This is a robbery, don't take me for a joke. No big bills, no funny money, no dye pack, no fifties, no hundreds and no

2

electronic devices." Defendant handed the teller an envelope and told the teller to put money in it. The teller put bank funds in the envelope. Defendant also stated to the teller something to the effect of, "You don't have to be hurt, you can go home safe." Defendant then took the envelope containing the money and left the teller counter. Defendant stole a total of approximately $1,974 from this TCF Bank branch.

A little over a week later, on or about April 9, 2011, defendant approached a teller at a TCF Bank branch within a Jewel-Osco store located at 3570 North Elston Avenue, Chicago, Illinois, and gave the teller an envelope, which was inside a white plastic bag. Defendant stated to the teller something to the effect of, "I want to do a withdrawal. Don't give me funny money. Give me all the money, give me hundreds." The teller put bank funds inside the envelope in the plastic bag. Defendant stated to the teller something to the effect of, "Give me more hundreds." Defendant then took the bag containing the money and left the store. Defendant stole a total of approximately $3,500 from this TCF Bank branch.

### C. Stipulated Offenses

On April 26, 2011, and May 2, 2011, defendant robbed the same TCF Bank branch within a Jewel-Osco store located at 1341 North Paulina Street, Chicago, Illinois. In the April 26, 2011, robbery, defendant handed the teller a brown manila, accordion-style envelope. Defendant told the teller to put money in the envelope. Defendant stated something to the effect of, "No funny money and don't touch the alarms." The teller put bank funds inside the envelope. Defendant also told the bank

3

manager not to press the alarm. Defendant took the envelope containing the money and left the bank. Defendant stole approximately $298 from this TCF Bank branch.

In the May 2, 2011, robbery, defendant placed a brown accordion-style folder on the teller counter at the TCF Bank branch and stated something to the effect of, "Give me all your money, this isn't a joke, no funny money, dye packs, or GPS. Open your bottom drawer." The teller handed money to defendant, who put it in the folder. Defendant further told the teller to open another drawer. The teller told defendant that he/she was the only teller signed on at the time and that he/she was not able to open another drawer. After repeatedly telling the teller to open the bottom drawer, defendant took the envelope containing the money and left the bank. Defendant stole approximately $887 from this TCF Bank branch.

In total, defendant stole approximately $6,659 during the aforementioned robberies.

### D.  Instant Offenses Committed While on Supervised Release

Defendant committed the instant offenses while on supervised release from his convictions for 11 counts of bank robbery in the Northern District of Ohio. Defendant absconded from supervision and was arrested on May 6, 2011, at a Travelodge Hotel in Chicago, Illinois. He registered at the hotel under a fake name and initially resisted arrest by struggling with the agents who executed the arrest warrant based on his violations of his supervised release terms. On or about August 9, 2011, in the

4

Northern District of Ohio, defendant was sentenced to 6 months' imprisonment for his supervised release violations.

### E. The Presentence Investigation Report

The government does not have any objections to the Presentence Investigation Report; however, the government notes that the Supplemental Presentence Investigation Report of November 8, 2016 (R. 109) erroneously states the applicable Guideline range as 121 to 151 months, instead of 151-188 months. The government concurs with Probation that the advisory Guidelines range for defendant is 151-188 months' imprisonment.

The government also concurs with the conditions of supervised release proposed by the Probation Officer, which are supported by the relevant § 3553(a) factors, namely, of protecting the public from further crimes of the defendant and provide defendant with needed vocational training and mental health treatment.

## II. SENTENCING CONSIDERATIONS

Among the relevant § 3553(a) factors are the applicable Guidelines range, any pertinent policy statements issued by the Sentencing Commission, and "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(4), (a)(5), (a)(6). Moreover, although the Guidelines are merely advisory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

### A. The Guidelines

There are at least two reasons the Court should give serious consideration to the Guidelines. First, the Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious consideration to the Guidelines. Second, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. It is true there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). Yet the Commission is "a respected public body with access to the best knowledge and practices of penology." *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, and these ongoing efforts to refine the Guidelines are another reason

6

to seriously consider the advisory range. In the event that this Court exercises its discretion to sentence outside the advisory range, there are guideposts for evaluating what the extent of the deviation should be and when a non-Guidelines sentence will be deemed unreasonable on appeal. These guideposts are set forth in Supreme Court and Seventh Circuit cases. First, the Supreme Court instructs that it is "clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. The degree of the deviation from the advisory Guidelines range is relevant in choosing the particular sentence. The Seventh Circuit has warned that major deviations from the advisory range are more likely to be unreasonable if the grounds for the deviation are "overstated mitigating factors" or "normal incidents" of the offense. *United States v. Carter*, 538 F.3d 784, 790 (7th Cir. 2008). Similarly, the Seventh Circuit admonishes that sentences relying on "common" factors, rather than "particularized" ones, to justify variances are less likely to be substantively reasonable. *Id.*; *see also United States v. Vrdolyak*, 593 F.3d 676, 681-83 (7th Cir. 2010).

    **B.**    **The Remaining § 3553(a) Factors**

Defendant's history clearly shows an abject failure to abide by the law. Defendant is a recidivist – a serial bank robber who has robbed, some with threats, <u>sixteen</u> banks since 2000. Defendant was previously convicted on December 3, 2002

for 11 bank robberies that he committed in the Northern District of Illinois, the Northern District of Ohio, the Eastern District of Pennsylvania, and the Southern District of Florida. Additionally, in 2001, defendant robbed a store in Pittsburgh, Pennsylvania and threatened to "blow [the store employee's] head off" if the employee did not comply with defendant's demand for money. After serving a significant federal sentence (97 months) for convictions on 11 counts of bank robbery in the Northern District of Ohio, defendant was released on August 7, 2009 and placed on supervised release. Despite having the opportunity to turn his life around, defendant absconded from supervision in January 2011 and fled to the Northern District of Illinois. Once in this district, defendant operated under an alias and robbed three TCF bank branches in Jewel-Osco stores, one of which he robbed twice. Defendant robbed these banks while the stores were occupied by many customers and thus jeopardized the safety and well-being of these individuals. Defendant also attempted to extort approximately $65,000 from Chase Bank and threatened to hurt the bank's employees if his demands were not met. Defendant also resisted arrested when law enforcement officers executed the arrest warrant for his supervised release violations. Defendant's long period of incarceration did not deter him from committing the same crimes while under federal supervision.

Here, defendant claims he could not control his gambling addiction and "in desperation … began robbing banks to cover his gambling losses." R. 126, at 1. However, defendant also admits to periods of "abstinence," when he did not rob any

8

banks. *Id.* at 7. So defendant was in fact able to control his behavior at certain times. And the evidence in this case shows that defendant indeed exhibited certain control over his actions. For example, before he was arrested in this case, defendant had in his possession books titled, "Hide Your Assets and Disappear" and "How to Be Invisible." Defendant's computer contained web pages of various Jewel-Osco stores, some of which had banks that defendant robbed. Defendant also had a map marked with the locations of various banks. He checked into the hotel, where he was ultimately arrested, using an alias. Defendant also had a "spoof" telephone card that allowed him to disguise his telephone number when he called Chase Bank to carry out his extortion scheme. All of this evidence demonstrates that the robberies were methodically planned out by defendant. Defendant did not rob the banks on a whim. The evidence belies defendant's claim that his gambling addiction was so "entrenched" that it created an uncontrollable impulse to rob banks. To the contrary, the planning of the bank robberies required time and patience and it was something that defendant had complete control over. If defendant needed a way to finance his gambling, he could have gotten a job, but instead, he chose to rob banks and repeatedly break the law. Additionally, while Dr. Goldman recently assessed defendant and concluded that defendant exhibited "many signs of having a pathological gambling disorder," neither Dr. Goldman's nor the other psychiatric evaluations explain how such a disorder could have compelled defendant to rob not just one or two, but <u>sixteen</u> banks.

Furthermore, the fact that U.S.S.G. § 5H1.4 explicitly prohibits a downward departure based on gambling addiction should dissuade this Court in considering defendant's addiction as a mitigating § 3553(a) factor. In this case, there is no evidence that defendant's gambling addiction was so crippling that he could not obtain a regular job or other legitimate sources of income to finance his behavior. Defendant robbed banks because it was easy money. And in the process, he terrorized tellers and other bank employees with whom he had contact.

Defendant's history clearly demonstrates that he is a danger to the public. He has failed to learn from his many past mistakes and has continued to jeopardize the safety of the public by his criminal behavior. In this case, he robbed three banks (one of which he robbed twice) and attempted to extort a significant amount of money from another, despite having the time and opportunity between the robberies to stop his dangerous conduct. Defendant's actions have a lasting impact not only because TCF Bank suffered a financial loss from his crimes, but also because defendant threatened the security and safety of the victim bank employees and other individuals present during the robberies. Defendant's robbery spree ended only because law enforcement arrested him. Defendant also committed these crimes while on federal supervision after having been convicted of multiple bank robbery convictions in another district. Therefore, it is abundantly clear that he cannot abide by the law and that the public must be protected from defendant. A sentence within the applicable Guidelines range

of 151 to 188 months is sufficient but not greater than necessary to protect the public and prevent defendant from committing future crimes.

### C. Restitution

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663. Defendant owes $5,474 to TCF Bank. Additionally, pursuant to 18 U.S.C. § 3663A(a)(3), defendant has agreed to pay additional restitution in the amount of $1,185 to TCF Bank. Thus, the total amount of restitution is $6,659.[1]

With regard to the timing and source of the restitution payment, in *United States v. Sawyer*, the Seventh Circuit appeared to hold that all existing assets at the time of sentencing must be turned over toward restitution. 521 F.3d 792, 795 (7th Cir. 2008).[2] In a later case, however, the Seventh Circuit held that there is a "preference" for immediate payment, rather than an absolute requirement. *United States v. Hosking,* 567 F.3d 329, 335 (7th Cir. 2009). As noted by *Hosking*, this preference for immediate payment is grounded in statutory text: "the court is also required to craft its restitution order 'pursuant to 18 U.S.C. § 3572'. . . which provides

---

[1] The government is attempting to confirm whether defendant has made any restitution payments – totaling approximately $200,000 – in connection with his previous bank robbery conviction in the Northern District of Ohio.

[2] "Only assets the prisoner had at the time of his sentence would be available as a realistic matter – and any existing assets should be seized promptly. If the restitution debt exceeds a felon's wealth, then the Mandatory Victim Restitution Act of 1996, 18 U.S.C. §§ 3663A, 3664, demands that this wealth be handed over immediately; a schedule of payments covers only how much the convict must pay from earnings (and any lump sums such as inheritances) in the future." 521 F.3d at 795 (emphases added).

that '[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments.' 18 U.S.C. § 3572(d)(i) (emphasis added)." *Hosking*, 567 F.3d at 335.[3]

In this case, the government requests that the Court exercise its discretion and include the following language in the judgment and conviction as to the timing of the restitution payment:

> The Court further orders that the defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations. In addition, 25% of defendant's future monthly disposable income shall be paid toward any remaining restitution or fine balance. Pursuant to 18 U.S.C. § 3664(k), the defendant must notify the Court and the U.S. Attorney's Office of any material change in the defendant's ability to pay restitution.

---

[3] Should the Court permit payment in installments, 18 U.S.C. § 3572(d) mandates that the length of time over which payments are to be made must be the shortest time in which full payment can be reasonably made. See 18 U.S.C. § 3572(d).

12

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a sentence within the advisory Guidelines range of 151 to 188 months' imprisonment, along with at least three years of supervised release, and a $300 special assessment.

    Respectfully submitted,

    JOEL R. LEVIN
    Acting United States Attorney

By:   */s/ Nicole M. Kim*
    NICOLE M. KIM
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604